of two-thirds of each house remove such disability."

This rule reflects two longstanding tenets of common-law crim-
inal jurisprudence: that the "truth of every accusation" against a
defendant "should after wards be confirmed by the unanimous suffer-
age of twelve of his equals  and neighbours", 4W. Blackstone,
Commentaries on the laws of England 343 (1769), and that "an acc-
usation which lack's any particular fact which the law makes ess-
ential to the punishment is *** accusation within the requirement
of common law, and it is no accusation in reason". In other words,
*** every fact which is legally essential to the punishment" must
be charged in the indictment and proved to a jury. 1J. Biship,
Criminal Procedure, ch. 6pp. 50-56 (2d Ed. 1872) **SEE: BLAKELY v.
WASHINGTON,** 542  U.S.___  (2004).

 The Commission is a creation of the SRA, which authorizes the
Guidelines. Accordingly, the Guidelines carry the force of law and
are "binding on Federal Courts". **SEE: STINSON  v.UNITED STATES,**
508 U.S. 36, 42 (1993).

As uniformly interpreted by the courts of Appeals, section
3553(b) of Title 18 of the U.S. Code prohibits sentences exceed-
ing the top of the applicable Guidelines range unless the Court
makes finding of fact that justify an upward departure. **SEE: E.G.
UNITED  STATES v.DAVERN,** 937 F.2d 1041 (CA 6 1991)(En banc): com-
pare id. at 1042 (Merritt, J., dissenting).

Even though the Commission is located in the judicial branch,
the ?? Supreme Court has treated the Guidelines as "the equivalent
of legislative rules  adopted by  Federal agencies". **SEE: STINSON,**
508 U.S. at 45 Guidelines promulgated pursuant to Congresional del-

gation under the SRA are subject to the Sixth Amendment in the same fashion as any statute or other legislative rule.

The Supreme Court applied the clause to a similar State sentencing scheme in **MILLER v. FLORIDA,** relying on the fact that the guidelines, far from being "flexible 'guidepost' for use in the exercise of decretion", significantly constrained Judicial decretion by requiring Judges to make particular  findins to justify departures from the guidelines sentencing range. 482 U.S. 423, 435 (1987).

Petitioner, submits that the **SUPREME COURT** settled this very issue around or about (12) years ago. It was argued December 10th, 1991. Decided March 24th, (1992) **UNITED STATES v. R.L.C.,** 503 U.S. 291, 117 L.Ed 2d 559, 112 S.Ct. 1329  [NO. 90-1577] (1992).

In this case the Supreme Court rejected the government's attempt to argue that on "authorized" sentence only refers to the penalty provisions in the "charging statute", rather than the limitations imposed through the Sentencing Guidlines. The same defense is anticipated to be raised in this case at bar by the government, and is therefore being addressed herein.

The Supreme Court in **R.L.C.,** held that the penalty provisions in the charging statute setting forth the maximum possible penalty **are not** to be given primacy over the maximum possible penalty permissible under the Sentencing Guidelines. Id. **R.L.C.,**117 L.Ed 2d 559 (1992). **SEE ALSO: APPRENDI v. NEW JERSEY,**   120 S.Ct. 2391 (O'Conner, J. with Rehnquisht, C.J. Kenndy and Bryer, J.J. join dissenting).

Under the stare decisis ("to stand by things decided") established in **R.L.C.,** supra, this Court lacked jurisdiction to impose a 19 year, 6 months sentence on Count One charged with the Petitioner, as

it exceeds the statutory maximum as established by the Jury's find-
ing in Petitioner's trial for an offense of conviction set by the
Sentencing Guidelines.

The District Court in **R.L.C.**, found the **R.L.C.**, a juvenile,
committed an act of juvenile delinquency withing the meaning of 18
U.S.C. 5031, because his acts would have been the crime of involun-
tary manslaughter in violation of 18 U.S.C. 1112 (a) and 1153 if
committed by an adult.

The maximum sentence for involuntary manslaughter under 1112(b)
was three years. At **R.L.C.'s** dispositional hearing the District
Court granted the government's request to impose the maximum penalty
for Respondent's delingquency and accordingly committed him to offi-
cial detention for three years.

Despite the manslaughter statute's provision for an adult sent-
ence of that length, **the Eight Circuit vacated R.L.C. sentence and
remanded for resentencing,** after concluding that (36) months exceed-
ed the **CAP** imposed by 18 U.S.C. 5037 (c)(1)(b) upon the period of
detention to which a juvenile may be sentenced. Id. **UNITED   STATES
v. R.L.C.,** 915  F.2d 320 (1990).

The government filed a petition for  Certiorari to the Supreme
Court, arguing that the maximum penalty authorized under statue re-
fers to the charging statute; not the maximum statute under the
Guidelines.

However, the United States Supreme  Court rejected that argu-
ment as follows:

"The government suggests a straight forward inquiry into the
plain meaning to explain what is **"AUTHORIZED"**. It argues that the

word **"AUTHORIZED"** must mean the maximum term of imprisonment pro-
vided for by the statute defining the offense, since only Congress
can **"AUTHORIZE"** a term of imprisonment in punishment for a crime.

As against the position that the Sentencing Guidelines now
circumscribe a trial Court's authority, the government insists
that our concern must be with the affirmative authority for impos-
ing a sentence, which  necessarily stem from statutory law. It main-
tains that in any event the Sentencing Commission's  Congressional
authorization to establish sentencing guidelines does not create
affirmative authority to set punishments for crime, and that the
Guidelines do not purport to authorize the punishments to which
they relate.

But this is to easy. The answer to any suggestion that the
**statutory character of a specific penalty provision** gives it pri-
macy over administrative sentencing Guidelines is that the mandate
**to apply the Guidelines is itself statutory.** **SEE**: 18 U.S.C. 3553(b)

More significantly, the government's argument that **"Authorized"**
refers only to what **is affirmatively provided by penal statutes**,
without reference to the **Sentencing Guidelines to be applied under**
**Statutory mandate, seem  to us to beg the question**.

Of course it is true that no  penalty would be **"Authorized"**
without a statute providing specifically for the penal consequences
of defined criminal activity.

The question however, is whether Congress intended Courts to
**treat the upper limit of such a penalty** as **"Authorized"** **even where**
**proper  application of a statutorily mandated guideline in an adult**
**case would bar imposition up to that limit, and an unwarranted up-**
**ward departure [503 U.S. 298] from the proper Guideline range would**

**be reversable error**. SEE: 3742.

Here it suffices to say that the government construction is by no means plain. The text is as least equally consistent with treating **"AUTHORIZED"** to refer to the result of applying all statutes with a required bearing on sentencing decision, including not only those that empower the Court to sentence but those that limit the ligitamacy of its exercise of that power. This, is indeed, is arguably the more natural construction". Id. **R.L.C.**, 503 U.S. 291, 117 L.Ed. 2d 559; **MISTRETTA v. UNITED STATES,** 488 U.S. 361, 102 L.Ed. 2d. 714 (1989).

In the instant case at bar, Petitioner statutory mandated guidelines were 121-151 months, thus, sentenced **84 months above** Petitioner **statutory mandated guideline range,** over 114 months over Petitioner's minimum range, in violation of Petitioner's Fifth, Sixth, and Fourteenth Amendment.

In **R.L.C.**, Supra, Respondent received on remand to the District Court 18 months.

Plain-meaning analysis **does not** then, **provide** the **Government** with a **favorable answer**. The most that can be said from examining the text in its present form is that the **Government** may claim its **preferred construction** to **be** one possible resolution of **statutory ambiguity**.

In quintessence, would it not be somewhat ingenuous to beleive that 18 U.S.C. 3553(b) and the mandatory minimun sentences are not serving two different punishments for the same offense.

Congress mandated the mandatory maximum/minimum sentences.;

Congress also mandated the Guidelines promulgated pursuant to Con-
tressional delegation under the SRA which are also subject to the
Sixth Amendment in the same fashion as any statute or other legis-
lative rule.

Thus, while the mandatory maximum/minimum sentences and 3553 (b)
sentences include telltale as being ambiguous. This ambiguity was
or would have resolved by an  amendment that, **absent promulgation
of the Guidelines,** might have left the question of the **"AUTHORIZED"**
maximum term of imprisonment to be determined only by reference to
the penalty provided by statute creating the offense. **SEE: UNITED
STATES v R.L.C.,** 503 U.S. 291, 117 L.Ed. 2d 559

### [ 503 U.S. 304 ]

The Legislative history **does not** prove, however, that Congress
intended **"AUTHORIZED"** **to refer solely to the statute defining the
the offense** "dispite" **the enactment of a statute requiring applica-
tion of the Sentencing Guidelines, a  provision that will generally
provide a ceiling more favorable to the defendant than that contain-
ed in the offense-defining statute.**

This is an expression of purpose  that today can be achieved
only by reading **"AUTHORIZED"** to refer the maximum period of impri-
sonment that may be imposed consistently with 18 U.S.C. 3553(b)
[18 U.S.C.3. 3553(b)].

That statute provides  that "[t]he Court **shall** impose a senten-
ce *** within the range" established for the category of offense
as set forth in the Guidelines, "unless the Court finds that there
exists an aggravating or mitigating circumstance of a kind, or to
a degree, not adequately taken into consideration by the Sentencing
Commission in formulating the guidelines  that should result in a

sentence different from that described." **SEE:** 3553(b).

**A statute is a statute**, regardless, whatever its label. The
United States Supreme Court do not think any ambiguity servives.
If any did, however, the Supreme Court would choose the Construct-
ion yielding the shorter sentence by resting on the venerable rule
of lenity; **SEE: UNITED STATES v. BASS,**  404 U.S. 336, 337-338, 30
L.Ed. 2d  488  (1971), rooted in "the instinctive distaste against
men languishing in prison unless the  lawmaker has clearly said they
should," Id., at 348, 30 L.Ed. 2d 488  (quoting **H. FRIENDLY,** Bench-
marks 209 (1967).

While the rule has been applied not only to resolve issues
about the substantive  scope of Criminal statutes, but to answer
questions about the severity of sentencing, **SEE: BIFULCO v. UNITED
STATES,** 447 U.S. 381, 65 L.Ed. 2d 205  (1980), its application is
necessary in this case, "the Supreme Court have always reserved len-
ity for these situations in which a reasonable doubt persists about
a statute's intended scope even after resort to **'the language and
structure, legislative history,  and motivating policies's of the
statute'**".

The rule of lenity states that **a Court cannot interpret a Fed-
eral Statute** "so as to increase the  penalty that it places on an
individual when such an interpretation can be based on no more than
a guess as to what Congress  intended". **SEE: LANDER v. UNITED STATES,**
385 U.S. 169, 178, 3 L.Ed. 2d 199 (1958).

The principle of construction applies to sentencing provisions
as well as to substantive criminal statutes. **SEE: BIFULCO v. UNITED
STATES,** 477 U.S. 381, 387, 65 L.Ed. 2d 205 (1980).

Therefore, the rule of lenity  favors the statutory construction that yields the shorter sentence and it was error for the Court to sentence Petitioner under harsher penalty provisions of a schedule II controlled substance where the element of quanity was more then was listed in the indictment, nor charged by the Grand-Jury.

## CONCLUSION

For  the reasons and documented facts listed above, and in the interest of Justice and fundamental fairness, this Petitioner should be granted his  relief. This Honorable Court should temper Justice with mercy before rendering a both fair  and honest opinion on the above matter.

Respectfully Submitted

Dated: 10/26/04

Darryl  Ford
#08943-040
F.M.C. Devens
P.O. Box 879
Ayer, MA.  01432

(16)



---



Mr. Ford was sentenced on April 19, 1996, by the Honorable
Robert Holmes Bell, United States District Court Judge for the
Western District of Michigan. He was convicted of violating
21 U.S.C. § 846 and § 841(a)(1), Conspiracy to Possess with the
Intent to Distribute, and Distribution of Cocaine and Cocaine
Base. He was held responsible for the distribution of 62
kilograms of cocaine base and was sentenced to a 235-month term
of imprisonment followed by a five-year term of supervised
release. His projected release date is September 3, 2015, via
Good Conduct Time.

After careful review of the totality of the circumstances, it
is inappropriate to release Mr. Ford at this time. At the time
the Presentence Investigation Report (PSR) was prepared, the
sentencing court was aware that Mr. Ford was in chronic renal
failure and would eventually need a kidney transplant. In
addition, on May 3, 2004, a transplant team at the University of
Massachusetts Transplant Center evaluated Mr. Ford, and is
continuing to follow their established process of evaluation to
place him on the cadaver kidney transplant list. He will
continue to receive medical care that is consistent with
community standards. He may request reconsideration of his RIS
request if the transplant center advises that he is not a viable
transplant candidate and his condition further deteriorates.
The denial of this request constitutes a final administrative
decision. Please provide Mr. Ford with a copy of this decision.


cc: D. Scott Dodrill, Regional Director, NERO





U.S. Department of Justice

Federal Bureau of Prisons

*Federal Medical Center, Devens*

---

P.O. Box 880
Ayer, MA 01432

September 16, 2003 $\quad$ ExhibiT (2)

Barbara Colby Tanase
Western District of M
P. O. Box 208
Grand Rapids, MI 495

Re:   FORD, Darryl
       Reg. No. 0894:
       Docket No. 1:9

Dear Ms. Tanase:

The above referenced inmate has submitted a request for compassionate release. A preliminary review of the request indicates Mr. Ford meets the eligibility requirements. Prior to submitting the request through the appropriate channels, we are required to solicit the opinion of the prosecuting Assistant United States Attorney.

Mr. Ford is currently serving a 235 month (PLRA) sentence for Conspiracy to Possess with Intent to Distribute Cocaine and Cocaine Base. He has a projected release date of September 3, 2015, via Good Conduct Time Release. Mr. Ford was sentenced by the Honorable Robert Holmes Bell in the Western District of Michigan on April 29, 1998. The details of his current medical condition are as follows.

Mr. Ford is a 32-year old African American male, who has end stage renal disease secondary to glomerulonephritis, which was diagnosed at the age of 16. For the past ten years, he has been on hemodialysis and most recently has ran out of vascular access points for continued hemodialysis. In order to establish vascular access for hemodialysis, he has had multiple surgeries including three arteriovenous (AV) fistulas in his left arm, one in the right arm, three in the right leg, and one in the left leg, all of which have been unsuccessful. He has no other dialysis access, therefore, peritoneal dialysis was initiated to treat his renal failure. However, this carries the risk of having a potentially serious life threatening intra-abdominal infection called peritonitis. Unfortunately, Mr. Ford has had this complication four times but thus far has managed to recover from the infection.



FORD, Darryl
Reg. No. 00-43426
Page 2 of 2

The University of Massachusetts Medical Center Urology Department has deemed him to be a good candidate for a kidney transplant. He has had several siblings tested for tissue compatibility as donors, however, none of them proved to be a kidney match. Mr. Ford's condition is urgent and could be terminal. His condition will worsen and cause death by mid life, unless he's able to secure a kidney transplant. He wishes to pursue this search upon release. If released to the community his level of care and anticipated medical needs would be significant, requiring dialysis and regular nephrology evaluations. He will have a better chance at achieving a cadaver kidney in the community, in order to save his life.

Concerning his health at the time of sentencing, the PSI reported that he was diagnosed with chronic renal failure in 1991 and had been receiving hemodialysis for the past seven years. He also had a serious problem with vascular access which made his dialysis inefficient. As a result, catheters were placed and he was advised that he needed a kidney transplant.

If released, Mr. Ford plans on living with his mother Jessie Ford in Kalamazoo, Michigan. Prior to his incarceration, he was under the care of two physicians in Michigan who knew his case well. He plans to make efforts to reconnect with them as he pursues arrangements for a kidney transplant. He will also be receiving Social Security Disability, Medicare and Medicaid, to help cover his medical and personal needs. We have forwarded correspondence to the United States Probation Office in the Western District of Michigan for review.

Please forward any comments or concerns held by your office regarding this proposal to Mr. Ford's assigned Unit Manager, John D. Colautti, at (978) 796-1367. Due to the deteriorating medical condition of Mr. Ford, we are expediting the request at all levels. Thank you for your time and cooperation in this matter.

Sincerely,

David L. Winn
Warden

Verdict

JUROR SEAT 7: Yes.

2    COURTROOM DEPUTY:  Mr. Obetts, were those your
3    verdicts?

4        JUROR SEAT 8:  Yes.

5    COURTROOM DEPUTY:  Mr. Bates, were those your
6    verdicts?

7        JUROR SEAT 9:  Yes.

8    COURTROOM DEPUTY:  Mr. Eggerding, were those your
9    verdicts?

10        JUROR SEAT 10:  Yes.

11    COURTROOM DEPUTY:  Mr. Bursley, were those your
12    verdicts?

13        JUROR SEAT 11:  Yes.

14    COURTROOM DEPUTY:  Ms. Eye, were those your
15    verdicts?

16        JUROR SEAT 12:  Yes.

17    THE COURT:  Okay.  Thank you.  You may be excused to
18 the jury room just briefly, and we have some paperwork that
19 our clerks have to do in connection with your being here and
20 we'll be with you in just a minute.  If you could just retire
21 shortly, please.

22    (Jury excused and left courtroom at about 1:40 P.M.)

23    THE COURT:  Anything for the court or to be brought
24 to the court's attention at this time?

25        It's my understanding that this is a conviction on

28

SHARON E. FOX, COURT REPORTER

Verdict

1  an 841(a)(1) offense, and under the statute the court is

2  required to remand the defendants pending sentencing.

3       Sentencing will be set for May 1 in the morning.  I

4  don't want to have everybody waiting around, so let me say

5  it's between 8:30 and 10:00 in the morning, and we'll do some

6  scheduling among those times for individual defendants, so if

7  counsel could just clear their schedules for early morning on

8  May 1, and we will get back with you as to a specific time.

9       Anything else anyone wishes to --

10       MS. TANASE:  Your Honor, with respect to the

11  Defendant Darryl Ford, I've spoken with the Marshals Service,

12  and in light of his medical condition it may be problematic to

13  continue with his dialysis while he is awaiting designation to

14  the Bureau of Prisons.  Apparently they would have to have him

15  seen by a new doctor before they could have him start

16  undergoing treatment.  The government does not oppose if the

17  court's inclined to do that, allowing Mr. Ford to remain out

18  on bond perhaps in a tether situation until such time as he's

19  sentenced given his serious medical condition.

20       THE COURT:  Mr. Garrett?

21       MR. GARRETT:  We'd seek the court's indulgence on

22  that matter.

23       THE COURT:  You understand that in doing so, I've

24  got a statute I'm flying in the face of.

25       MS. TANASE:  I understand, Your Honor.

                                                          29

SHARON E. FOX, COURT REPORTER

Verdict

1      THE COURT: Due to the serious medical condition of
2  Mr. Ford as illustrated by a letter from his doctor and the
3  extreme expense that is involved and the necessity of his
4  securing medical care that he's presently under, the court
5  will require a 24-hour house tether at the present address
6  where he resides to be worked out with Pretrial Services with
7  medical release for purposes of securing the required
8  dialysis, and I'm going to require weekly pretrial service
9  checkups on this matter, and we will then continue him as
10 though he were incarcerated but he's in his home and he has a
11 medical release.

12      Anything else from anyone else?

13      Okay.  Thank you.  Thank you, for the lawyers who
14 have given of your service to this court in this matter, and
15 we'll look forward to seeing you later.

16      That's all.

17   (Proceedings concluded at 1:42 P.M.)

18

19

20

21

22

23

24

25

30

SHARON E. FOX, COURT REPORTER



Instructions

1  and then the charges set forth, conspiracy to possess with

2  intent to distribute and distribute cocaine and cocaine base,

3  and each one of these defendants' names listed, and beside the

4  name are two boxes, that of not guilty and that of guilty.

5  You will check one box for each one of these defendants, and

6  then at the conclusion your foreperson will sign it and date

7  it.  Again, this is just a form, and it's intended to assist

8  you once you have reached your conclusion in this matter.

9       Now, if you decide that the government has proven a

10  defendant guilty, then it becomes my task to determine what

11  the appropriate punishment should be.  Deciding what the

12  punishment should be is my task and not yours.  It would

13  violate your oath as jurors to consider possible punishments

14  in deciding upon your verdict in this matter.

15       Let me conclude by repeating something I said

16  earlier, and that is nothing that I have said during the trial

17  nor in these instructions was intended to influence your

18  decision in any way in this case.

19       Now, in this case we have 14 of you who have been

20  here with us.  Unfortunately, only 12 are required to

21  deliberate and only 12 can deliberate, and the reason for

22  having 14 is that many times family emergencies arise, people

23  become ill, or something else occurs, and we have to excuse a

24  juror, and by having extra jurors we can keep right on with

25  the trial and don't have to stop it.

23

SHARON E. FOX, COURT REPORTER